# IN THE COURT OF APPEALS OF IOWA

No. 19-1576
Filed December 16, 2020

**BETTY BLACK,**
        Plaintiff-Appellant,

**vs.**

**ROBERT JORGENSEN, JR., Individually and as Trustee
of the ROBERT JORGENSEN, JR. TRUST,**
        Defendants-Appellees.
_____

**ROBERT JORGENSEN, JR., Individually and as Trustee
of the ROBERT JORGENSEN, JR., TRUST,**
        Counterclaim Plaintiffs,

**vs.**

**BETTY BLACK,**
        Defendant to Counterclaim
_____

        Appeal from the Iowa District Court for Lucas County, Michael Jacobsen,

Judge.

        Betty Black appeals a district court ruling quieting title of disputed property

to the Robert Jorgensen, Jr. Trust. **AFFIRMED.**


        Stephen P. Dowil of McEnroe, Gotsdiner, Brewer, Steinbach & Rothman,

P.C., West Des Moines, for appellant.

        Bradley M. Grothe of Craver Grothe & Cox, LLP, Centerville, for appellee.


        Heard by Bower, C.J., and Vaitheswaran and Greer, JJ.

**BOWER, Chief Judge.**

This case arises from a boundary dispute between Betty Black and the Robert Jorgensen, Jr. Trust.[1]  Black seeks quiet title and damages relating to a disputed area where her property adjoins the Jorgensen property.  We affirm the district court ruling finding the Jorgensen Trust to be the owner of the disputed area and dismissing Black's trespass and damages claims.

### I. Background Fact & Proceedings

Black's parents purchased eighty acres of land in 1956.  Her brother Glen acquired the property in 1979, transferred it to his family trust in 2010, and Black purchased the property in 2014.  The property is primarily wooded, and the tillable ground has been in the conservation reserve program (CRP) since 1998.[2]  Black does not live on the property.  Glen does most of the work for Black's property with help from his son Galen.

In 2006, Jorgensen acquired the eighty acres directly to the east of Black's property.  Before Jorgensen, Raymond and Helen Labatut owned the property until 1970, and then Warren and Helen Rush owned it until 2005.  The Rushes sold the land in 2005.  In 2006, Jorgensen acquired it under a corporate name, transferred it to his own name, and eventually transferred title to his nominative trust.  Jorgensen owns additional land abutting this property to the north and east.

The boundary of record concerning the disputed area is a government survey line.  The district court found the line between the Black and Jorgensen

---

[1] We will refer to both Robert Jorgensen and the Trust as "Jorgensen."
[2] The disputed property is not part of the CRP.  The USDA map shows the eastern border of the Black property as the government survey line.

properties "lies in and through a steep and wide drainage ditch. The drainage ditch is densely wooded and vegetated. The drainage ditch and creek drains water from both the Jorgensen and Black parcels. The drainage ditch and creek renders fencing along the majority of the government boundary line essentially impossible."[3] Until the early 1990s, the ditch had flood events. Then, a dam was built up stream to curtail flooding, but the ditch still carries a lot of water at times.

Each deed transfer over the past sixty years for both properties describes the properties in fractional terms of section 18. Neither property's deed includes an exception or easement, nor otherwise indicates a property line different from the government survey line.

In 1960, Raymond Labatut, then the owner of Jorgensen's property, hired Black's father to replace a fence along the top of the ridge on the east side of the ditch. Neither Labatut nor Black's father was alive to testify whether they understood the fence to be a boundary fence or interior barrier fence. Glen and a neighbor, who were teenagers at the time, helped Black's father construct the fence. The fence ran along the boundary of record at the north end of the ditch, curved along the ditch footprint, and returned to near the survey line on the southern end of the property.[4] The Labatuts and then the Rushes kept cattle in a pasture bordering Black's, and the fence kept them out of the ditch.[5]

Black and her predecessors in title have maintained the northern portion of the fence, including replacing the fence around 2005, and Jorgensen and his

---

[3] The parties stipulated Jorgensen is the owner of record of the disputed area.
[4] Black's father had a fence on the west side of the ditch to keep his cattle out of the ditch.
[5] Jorgensen has not run cattle or other livestock near the disputed area.

predecessors were responsible for maintaining the southern portion.[6] Warren Rush did not replace the southern portion of the fence when Glen had the north portion replaced. Glen told Jorgensen shortly after his purchase of the property that he and Rush had maintained the fence on a "left hand rule," rather than the traditional "right hand rule,"[7] and said Jorgensen's portion needed to be replaced.

The disputed property consists of 6.44 acres between the boundary of record east to the fence that had been maintained by Black's and Jorgensen's predecessors. Witnesses described the property as "worthless" for cultivation, and Black and her predecessors have not harvested trees from the area. Galen would occasionally graze cattle on it, and Black's family and friends used the land for hunting.[8] Neither Black nor Glen ever discussed with Jorgensen or the Rushes that they considered the old fence to be the boundary line rather than the government survey line, reasoning they "all knew" where the boundary was. Warren Rush Jr. said his understanding was the boundary was an old fence running through the ditch "along the creek," the fence up on the hill east of the ditch was an interior fence, and his family maintained all of it as it curved around the ditch.

---

[6] Neither abstract of title references a fence agreement between property owners. *See* Iowa Code § 359A.12 (2017) (establishing adjoining landowners may enter into an enforceable and conclusive agreement as to who maintains each part of a fence between their lands and have it recorded as part of the property deeds).

[7] The "right-hand rule" means that if two adjoining property owners were to face each other at the center of the fence along their shared boundary line, each would be responsible for the half of the fence to his or her right. *See* David S. Steward, Note, *Iowa Agricultural Fence Law: Good Fences Make Good Neighbors*, 43 Drake L. Rev. 709, 713 (1995).

[8] The Black family's deer stands were not on the disputed property.

The Black family and friends, the Rushes, and other neighbors had all hunted in and near the disputed area for many years. Evidence of trespassers has been found in the area, and Jorgensen complained about trespassers to his neighbors soon after he purchased the property. Jorgensen encountered people hunting and running dogs on his land, some of whom claimed to have been directed there by the Black family. In late 2015, Jorgensen advised Galen he would install a high fence to keep out trespassers and protect the equipment he stored on the property.

In 2016, Jorgensen built a new, eight-foot fence on three sides of his property, including along the boundary shared with Black.[9] As part of the fence construction, Jorgensen cleared seventy to eighty feet along the edge of the ditch and his property line of trees and brush. He also filled small drainage ditches and installed culverts and sediment basins to control erosion.

The new fence runs along the government survey line on the north end of the Black-Jorgensen boundary, curves along the east embankment of the drainage ditch, and ends close to the government survey line in the south. Black claims the new fence was built to the west of the 1960 fence, though Jorgensen claims the old fence was not where Black and Glen indicated. Just under two acres of land falls between where the old fence allegedly ran and Jorgensen's new fence. Another four and a half acres between the new fence line and the government survey line in the ditch. Black claims ownership of the land between the survey

---

[9] Jorgensen's fence enclosed approximately 480 acres, including the eighty acres acquired from the Rushes.

line and where she estimates the 1960 fence sat. In the map below from Daniels's survey, Black's property is on the left and Jorgensen's is on the right.



In May 2017, Black sent a cease-and-desist letter to Jorgensen, alleging the new fence was on her property and that his construction was eroding her property. Jorgensen ceased any work he had planned on the fence, which included erosion mitigation work.

On August 30, 2017, Black filed a petition to establish a boundary, and included claims of trespass, nuisance, and conversion. Black sought a permanent injunction against Jorgensen and requested punitive damages. Black also asserted alternative theories of boundary by acquiescence and quiet title (adverse possession). Jorgensen counterclaimed with a petition to quiet title and requested an injunction.

Black and Jorgensen each hired a surveyor to examine the boundary area in dispute. Glen painted lines where he estimated the prior fence had been placed before Jorgensen's work for the surveyors to observe. The surveyors—Chad Daniels and Todde Folkerts—worked together and created their maps based on a shared set of coordinates.

When asked about why no fence remnants were found on the government survey line, Daniels testified,

> It is almost impossible or impractical to build a fence on the deed line, and that is why we didn't find any fence on the southern end of this property. The northern end is within limits of where a fence should be, where you think it would be in a spot that has never been surveyed.
> . . . .
> Q. Why would you say this is impractical to put a fence on that section line? A. Because of rain washing out the fence all of the time. It would just not last. It would be a waste of money.

No witness suggested a fence down in the drainage ditch could have been maintained through the flooding waters.

A bench trial was held June 19 through 21, 2019. In addition to testimony and exhibits, the court inspected the property at the request of both parties. When the court issued its ruling, it found Black did not prove a boundary by acquiescence, boundary by practical location, or adverse possession, and the disputed area belonged to the Jorgensen Trust. The court also denied Black's conversion, nuisance, trespass, damages, and injunctive relief claims.

Black appeals.

## II. Standard of Review

"[O]ur appellate standard of review of an acquiescence claim is statutorily defined as correction of errors at law." *Albert v. Conger*, 886 N.W.2d 877, 879 (Iowa Ct. App. 2016). However, we may review the disposition de novo if the parties agree "that the claims were equitable and tried in equity" and if we resolve the issue the same way as if reviewed for correction of errors at law. *Id.* Here, the parties agree and the court noted at trial that all matters were tried in equity, therefore we review de novo. *See* Iowa R. App. P. 6.907. "The doctrine of practical location is equitable in nature" and is also reviewed de novo. *Jager v. Bracker W. Farm Corp.*, No. 07-0268, 2007 WL 2713003, at *2 (Iowa Ct. App. Sept. 19, 2007). Likewise, our standard of review for adverse possession in a quiet-title action is de novo. *Albert*, 886 N.W.2d at 879.

## III. Analysis

### A. Boundary by Acquiescence.

A boundary by acquiescence is established "[i]f it is found that the boundaries and corners alleged to have been recognized and acquiesced in for ten years have been so recognized and acquiesced in." Iowa Code § 650.14. "A

party seeking to establish a boundary other than a survey line must prove it by 'clear' evidence." *Egli v. Troy*, 602 N.W.2d 329, 333 (Iowa 1999) (quoting *Tewes v. Pine Lane Farms, Inc.*, 522 N.W.2d 801, 806 (Iowa 1994)). Acquiescence "may be inferred from silence or inaction of one party who knows of the boundary line claimed by the other and fails to take steps to dispute it for a ten-year period." *Tewes*, 522 N.W.2d at 806. "There is no requirement of some overt act in order to establish acquiescence." *Ollinger v. Bennett*, 562 N.W.2d 167, 171 (Iowa 1997). "Acquiescence in the existence of a fence as a barrier, not as a boundary, is not such recognition as will establish it as the true line." *Brown v. McDaniel*, 156 N.W.2d 349, 352 (Iowa 1968). "Each of the adjoining landowners or their grantors must have [had] knowledge of and consented to the asserted property line as the boundary line." *Tewes*, 522 N.W.2d at 806.

Factors considered in the past to determine if acquiescence has been established include maintaining and improving the property, cultivation up to a fence line, requesting permission for an activity on the property, or one party telling the other the fence was not the true boundary during the period of acquiescence. *See Ollinger*, 562 N.W.2d at 171–72 (collecting cases); *Tice v. Shangle*, 164 N.W. 246, 249 (Iowa 1917).

The district court found Black failed to establish acquiescence by clear evidence. Among important indicators, the court noted, "[n]one of the adjoining landowners ever discussed that the old fence was the boundary line" and Warren Rush Jr. testified that his family believed the fence was a barrier and the boundary was in the ditch to the west of the fence. Black's alleged ten years of acquiescence would necessarily require some years the Rushes were living on the property.

Acquiescence is determined in light of the facts presented. *Albert*, 886 N.W.2d at 880. We accord great weight to the district court's factual findings because it "is in a far better position to weigh the credibility of witnesses than the appellate court." *Id.* Here, Black failed to establish by clear evidence Jorgensen or his predecessors knew of or consented to Black's claim the boundary was the fence line where it curved around the drainage ditch on the Labatut/Rush/Jorgensen property. Black's father was hired to replace the fence in 1960, and Labatut dictated the wood used for the posts; if it had been a boundary fence, Black's father would have had control over the fencing decisions for the north forty and would not have been paid for replacing that part of the fence.

Friends and family of both property owners have used the ditch area for recreational purposes, with neither side improving it. Moreover, testimony from both sides indicated any fence which may have existed along the government survey line would have been washed away by significant flooding through the ditch over the years. The evidence shows Black and her predecessor never discussed the boundary with their neighbors, and the neighbors—since at least 1970—considered the survey line to be the boundary line. We affirm the district court's ruling on the claim of boundary by acquiescence.

**B. Doctrine of Practical Location.**

The doctrine of practical location is similar to acquiescence. "The doctrine of practical location, as recognized and defined in Iowa cases, is grounded on principles of express agreement, estoppel and equity." *Kendall v. Lowther*, 356 N.W.2d 181, 188 (Iowa 1984). Practical location does not include the ten-year requirement for a boundary by acquiescence, but has the prerequisite that "the

true boundary must first be disputed, indefinite and uncertain, and the parties must have the intent to settle the boundary line in dispute." *Id.*

The district court ruled,

> In the case before the court Black and Jorgensen had no intent to settle a dispute over their parcels at the time of transfer because they were not aware of a dispute. Further, the deeds to their properties were consistent with each other by legal description. Finally, Black has not shown by evidence in the record that at the time of conveyance to either Betty Black or Jorgensen (including his immediate predecessors from Rush) that the boundary was evident or pointed out to them. Finally, there is no evidence in the record that the parties accepted the marked boundary by their words or actions which amount to express approval of the marked boundary. Black has failed to prove by clear evidence boundary by practical location.

Black has not established the boundary was disputed, indefinite, or uncertain. Rather, the county plat maps, assessor's aerial photos, the USDA maps used to identify the CRP land, and the legal descriptions all indicate a straight line border between the properties while only testimony from Black and her family supports a different border. Nor has she established the parties or their predecessors had the intent to establish a new boundary with the prior fence. The fact that the government survey line was not easily observable and it was impossible to maintain a fence along that survey line does not mean the first fence was by default the new boundary and approved by both property owners. Black has failed to establish a boundary under the doctrine of practical location.

**C. Adverse Possession.**

Black claims that if we find no boundary by acquiescence or practical location at the fence line, then she should be quieted title under the theory of adverse possession.

To establish adverse possession, the party "must establish hostile, actual, open, exclusive and continuous possession under claim of right or color of title for at least ten years." *Louisa Cnty. Conservation Bd. v. Malone*, 778 N.W.2d 204, 207 (Iowa Ct. App. 2009) (citation omitted). "Proof of these elements must be 'clear and positive.'" *C.H. Moore Tr. Est. v. City of Storm Lake*, 423 N.W.2d 13, 15 (Iowa 1988) (citation omitted). "Since the law presumes possession is under a regular title, the doctrine of adverse possession is strictly construed." *Id.*

"The possession must be such 'as ordinarily marks the conduct of owners in general in holding, managing, and caring for property of like nature and condition.'" *Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 818 (Iowa 2000) (citation omitted).

The disputed area was not often used by either party or their predecessors.[10] Members of the Black family would occasionally hunt in the area but never established hunting stands in the disputed area. Their cattle wandered into the area for brief periods when grazing was permitted under the CRP agreement. No other use was asserted, including any economic use such as cultivation or tree harvesting. The only improvement asserted was the fence upkeep for the north forty, which Warren Rush Jr. testified he also maintained around the disputed area. We note testimony indicated hunting and wandering cattle also extended onto undisputed Jorgensen property. Rush Jr. testified he

---

[10] Black concedes "neither party substantially used the disputed 6.44 acres near the ditch" but asserts her family used the area "more" so title should be quieted to Black.

had hunted in the area since he was a child. Jorgensen and his friends used the disputed area for mushroom hunting and deer hunting.

Black failed to establish by "clear and positive" evidence that her family had exercised hostile, actual, open, exclusive, and continuous possession of the disputed area for at least ten years.

We affirm the district court ruling and reject Black's boundary and property claims, and confirm ownership of the disputed area lies in the title holder Robert Jorgensen, Jr. Trust.

**D. Trespass and Punitive Damages.**

Black reiterates her claim of trespass on appeal and requests punitive damages and attorney fees. Black's appealed trespass and damages claims—that Jorgensen's excavation, grading, and fence work damaged her property—rely on the premise the disputed area belongs to Black and not Jorgensen.

Because we affirm the district court's finding on the boundary claims and confirming ownership by the Robert Jorgensen, Jr. Trust, Black's trespass and punitive-damage claims fail.

**AFFIRMED.**